## Wilson v. Watson.

(Decided June 21, 1911.)

### Appeal from Carlisle Circuit Court.

Islands—Riparian Rights of—In those jurisdictions, including Kentucky, which have adopted the common law rule that carries the title of riparian owners to the middle thread of the stream, an island, separately granted by the Commonwealth, and without any right or conflicting claim shown by the owner of the mainland, has all the riparian rights that attach to a mainland.

JOHN E. KANE and ROBBINS & THOMAS for appellant.

JESSE F. NICHOLS for appellee.

RESPONSE TO PETITION FOR REHEARING DELIVERED BY JUDGE MILLER—Withdrawing former opinion in part and reversing.

The decisive question in this case is found in that paragraph of the opinion which holds that the doctrine of riparian ownership of the bed of a river, which is an incident to the mainland, should not be extended to islands. Wilson v. Watson, 141 Ky., 328. If the doctrine of riparian ownership applies to islands, this case should be reversed; otherwise, the opinion must stand as written. It may aid in the solution of the question to recur to some of the principles concerning riparian ownership that may be considered as established. In the first place, where a stream is used in a grant as a boundary or monument, it is used as an entirety to the center of it, and to that extent the fee passes. 3 Kent's Com., 428.

It is also an elementary principle, and necessarily follows, that a riparian owner is entitled to all accessions made to his land by the retreating of the river from its former limits, or by slow and secret deposits so as to leave the soil theretofore inundated, uncovered by water. Hogan v. Campbell, 8 Port., 9, 33 Am. Dec., 267; Girard v. Hill, 1 Gill & J., 249; Patterson v. Gelston, 23 Md., 447; Mento v. Delaney, 7 Or., 337; Lammers v. Nissen, 4 Neb., 245; Benson v. Morrow, 61 Mo., 353; Barney v. Keokuk, 94 U. S., 324; Cook v. Burlington, 30 Iowa, 94.

Alluvium is a deposit, usually of mingled sand and mud, resulting from the action of fluviatile currents, and is applied by geologists to the most recent sedimentary deposits, especially such as occur in the valleys of large rivers.

Accretion is the increase or growth of property by external accessions, as by alluvium naturally added to land situated on the bank of a river, or on the sea-shore.

Reliction differs from alluvium in this; that the former term is applied to land made by the withdrawal of the waters by which it is covered. The withdrawal of the waters must be slow, gradual and imperceptible. The same general rules apply to it as to alluvium. (Murray v. Sermon, 1 Hawks, 56; Warren v. Chambers, 25 Ark., 120, 4 Am. Rep., 23; Boorman v. Sunnucks, 25 Wis., 235.)

Schultes on Acquatic Rights, 138, says:

"All islands, relicted land, and the soil of inland, un-navigable rivers and streams under similar circumstances, belong to the proprietor of the estates to which such rivers act as boundaries; and hence it may be considered as law that all islands, sand-beds, or other parcels of agglomerated or concreted earth which newly arise in rivers, or congregate to their banks by alluvium, relictum or other aqueous means, as is frequently to be observed in rivers where the current is irregular, such accumulations or relicted property belongs to the owners of the neighboring estates."

The Roman law does not differ, for in the Institutes of Justinian it is said:

"Moreover, the alluvial soil added by a river to your land becomes yours by the law of nations. Alluvion is an imperceptible increase, and that is added by alluvion which is added so gradually that no one can perceive

how much is added at any one moment.'' (Lib. 11., Tit. 1, Sec. 20.)

The islands in controversy in this case were formed some forty or fifty years ago around a tow-head, which grew up by accretions from the bed of the river. They were then, as now, far within the middle thread of the stream of the Mississippi River and thus have always been Kentucky lands. Whatever changes there may have been during that time in the course and banks of the Mississippi, have not changed the relative location of these islands with respect to the middle thread of the river. Furthermore, Island No. 3 was granted by the Commonwealth in 1837 as an independent survey, and entirely separate from the mainland. No owner of the mainland is claiming, or has ever claimed any part of Island No. 3 by virtue of riparian rights which attached to the mainland. It may be that Island No. 3 was granted by the Commonwealth prior to the grant of the mainland; or, it may be that the mainland was restricted in its boundary to the edge of the water, or by other terms, which would deprive its owner of his common law riparian rights. This case, therefore, is to be tried as though Island No. 3 was mainland. If it is to be so treated, and is not restricted in its description, there is no reason, in principle, why it should not have the usual common law riparian rights that attach generally to the mainland. The reason for the rule that the owner of the mainland owns the intervening new islands to the middle thread of the stream is found in the fact that the new islands have been built up from the bottom of the river; and the owner of the mainland being also the owner of the bottom of the river to the middle thread of the stream, owns the land to that point, whether it be under the water, or above the water.

It is contended by appellee that appellant's paper title invested him with the title only to the extent of the lands specifically described in the deed; while appellant contends that the description of the lands contained in his deeds, and in the deeds of his remote vendors, invested him not only with the title to the land specifically described therein, but also with the title to all accretions and additions that have been made thereto.

By instruction ''I'' the circuit court defined ''accretion'' as folows:

''An accretion, within the meaning of No. 1, is the process of gradual and imperceptible increase of land

caused by the deposit of earth, sand and sediment thereon by contiguous waters, and under the law of Kentucky the plaintiff in this case is entitled to hold everything as accretions or made land which may be formed at any point on the east side of the thread or middle flow of the waters of the Mississippi River and west of and adjoining to the lands patented to plaintiff's vendor in 1872 and 1837."

And, after having further instructed the jury to find for the appellant if they believed the islands in controversy were accretions to appellant's land, the court gave instruction "N," as follows:

"The court also instructs the jury that if they believe from the evidence that the land in controversy had formed and was in its present state of existence, or substantially so in 1872 or 1837 when William Parsons and Edrington, the plaintiff's remote vendors, took out their patents of that date, then in no event can said land be an accretion to said land patented by William Parsons in 1872, or Edrington in 1837, and the law is for the defendant and the jury should so find."

By instruction "H" the jury were told that appellant's title papers did not actually cover the islands in controversy, and that appellant could claim them only in case they were accretions to Island No. 3, which was owned by appellant and covered by his title papers.

The court refused to give an instruction offered by appellant recognizing his riparian right of ownership to the islands, and declined to recognize that right to any extent, except in so far as it arose under the doctrine of accretion as above limited.

This ruling followed the ruling in the late case of Hilleary v. Watson, 30 Ky. L. R., 1262, which arose over an island adjoining Island No. 3, and ignored the question of appellant's claim to the alluvial soil emerging from the bed of the river, as having no bearing upon the case. But, if appellant's theory of the case be correct, he, as owner of Island No. 3, owns the bed of the river to the middle of the stream, including all islands created thereon by alluvial deposits, as well as accretions thereon; and the proximity of the new islands to Island No. 3, by accretion, rather than separate alluvial formations, is not the test of his ownership.

In discussing this general question in Cruikshanks v. Wilmer & Wilson, 93 Ky., 20, this court said:

"It is well settled by this court, that if a river is one of the lines of a tract of land, the river is considered as a single line, and the owner's title extends, by construction of law, to the middle of the river; and if the low-water mark is extended toward the middle of the river by accretion, or is washed in by the action of the water, the owner's line must be fixed in the middle of the river from low-water mark, as it may be extended by the accretions or diminished by the action of the water. (Ky. Lumber Co. v. Green, 87 Ky., 257; Greenleaf v. Kilton, 11 N. H., 530; Luce v. Carley, 24 Wend., 451.)

"It will be at once seen that where there is an accretion to the shore land within the boundary of the owner, and as his line extends to the middle of the stream, the accretion is not, therefore, an acquisition of a separate estate; but the soil from above is simply dumped upon the land of the owner that was under the water, which is thereby made shore land. So, also, if the owner's title only extended to low-water mark, he would be entitled to the accretion, to the shore land as a part of the shore land; because as he would be compelled to sustain any loss in acreage that might result from the shore washing and falling in the river. he would be entitled to any gain in acreage that might be acquired by accretion to the extent of low-water mark as fixed by the accretion. The owner would be entitled to the accretion in either case as a part of the land that he held by his original title, and not as an estate that was separate from that held by the original. It follows that any conveyance or mortgage of the owner's estate described by the terms of the original title and not expressly excluding the accretion, would convey the title to the whole estate—accretions and all. The mortgages here are on the 'John Green farm,' and as the accretion is a part and parcel of the 'John Green farm,' the mortgages include the accretion." See also Thomas Jefferis v. East Omaha Land Co., 134 U. S., 178; St. Louis v. Rutz, 138 U. S., 245; Hardin v. Jordan, 140 U. S., 380; Mitchell v. Smale, 140 U. S., 414.

These cases recognize as established, the rule contended for by appellant, that the descriptions contained in the original grants carry with them title to the middle of the river, and to all of the additions and accretions that have been formed to his lands since the same were originally granted by the State.

By section 198 of the Kentucky Statutes, which fixed the boundary line of the State, it is provided that from the point at which the line between this State and Tennessee intersects the Mississippi River, the boundary line of this State shall be up the river in the middle thereof to the mouth of the Ohio River at Cairo, so as to include, among other islands, Island No. 3, which is owned by appellant. The ownership or title of the State of Kentucky, therefore, extends to the middle of the Mississippi River, and includes Island No. 3, which is here recognized and described by the State as a separate and distinct tract of land from the mainland.

In Wiggenhorn v. Kountz, 23 Neb., 690, 8 Am. St. Rep., 150, the court said:

"Where the mainland and the island have been separately surveyed and sold by the government to different parties, the grantees of the mainland do not by such grant acquire the island. In such cases, the grant to each being separate and distinct, neither can claim beyond the calls of his entry and patent. The rule is, that where there is a clear reservation of islands in a grant of mainland adjacent to a river, either expressly or by necessary implication, such islands do not pass to the grantee, and the filum aquae which bounds the grant is the center thread between the shore and the island. In such cases two fila aquae are established, one on each side of the island."

The same doctrine is recognized in Stolp v. Hoyt, 44 Ills., 223; Trustees of Hopkins Academy v. Dickinson, 9 Cush, 544; People v. Canal Appraisers, 13 Wend., 355; and in Buse v. Russell, 86 Mo., 209.

In the trial of this case the circuit judge confined appellant to his rights by accretion, and rejected an instruction based upon the theory that riparian rights could attach to an island in any other way. In so ruling we think he was in error. In those jurisdictions where the common law rule of riparian rights is not in force, the title of a riparian proprietor extends merely to the low-water mark, and the title to the bed of the stream necessarily remains in the sovereign. And, in order that a riparian owner may acquire title to lands by accretions in those jurisdictions, they must grow to and be added to his shore line—the mainland. All islands, towheads, and bars that may form in the stream, and not connected with the shore, necessarily belong to the

sovereign, for the reason that they form upon the property of the sovereign, and not upon or against the land of the riparian owner. On the contrary, in those jurisdictions where the common law rule of riparian rights is in full force, as in Kentucky, a grant by the sovereign carries the title of the riparian proprietor to the middle of the stream, and the sovereign parts with all of its title to that point, including all bars, tow-heads and islands that form between the mainland and the middle of the river, regardless of the fact as to whether they may not be connected with the mainland. In such cases the bed of the stream was already there, and belonged to the owner of the mainland; and the soil was merely dumped upon it from above so as to raise it above the waters, in the shape of an island. It is laid down by all the authorities that the owner of the mainland owns the intervening and newly made islands by virtue of his ownership of the bed of the river.

Or, as is pertinently said by Prof. Minor:

"Islands newly arising belong to the proprietor of the bed of the water out of which they arise. If it be a public water, the bed belongs to the public, and the new island follows the ownership of the bed. If the water be private, the bed is generally private, and belongs, for the most part, to the riparian owner." 1 Institutes, 492.

The patent to Price and Edrington describes the island by metes and bounds, and as containing 237 1-2 acres of land, lying and being in the County of Hickman, in the State of Kentucky, being the whole of Island No. 3 in the Mississippi River; and we are asked to say that this island, formally recognized by the State in fixing its boundary line, and by a separate grant, shall be denied those riparian rights which go with the mainland, merely because it is an island.

In 2, Blackstone's Commentaries, p. 261, we read:

"Bracton tells us,that if an island arises in the middle of a river, it belongs in common to those who have lands on each side thereof; but if it be nearer to one bank than the other, it belongs only to him who is proprietor of the nearest shore; which is agreeable to, and probably copied from, the civil law. Yet this seems only to be reasonable, where the soil of the river is equally divided between the owners of the opposite shores; for if the whole soil is the freehold of any one man, as it usually

is whenever a several fishery is claimed, there it seems just (and so is the constant practice) that the eyotts or little islands, arising in any part of the river, shall be the property of him who owneth the piscary and the soil."

Gould on Waters, Sec. 166, says:

"If an island in a private river has been lawfully appropriated by another person, or reserved in a grant, the thread of the stream midway between the island and the fast land is the boundary of the adjoining owner's title."

"If," says Schultes on Aquatic Rights, "between an island which lies nearest and belongs to a neighboring estate, and the contrary bank of a neighbor, which is on the other side of the stream, another island shall arise, then the admeasurement of property shall be made from the first island, and not from the estate to which it is apportioned by vicinity." (Quoted by Gould, Sec. 166.)

The views above expressed have been elaborated and applied in different ways and degrees in many cases. It will be sufficient to consider a few of the more pertinent ones.

McCullough v. Wall., 4 Rich. (S. C.), 81 (1849), was an action of trespass to try the title to a rock, unually covered by water in the Catawba River, which the defendant occupied as a fishing station. The rock was situated between the western bank of the river and Hill Island. The width of the stream east of Hill Island was less than that west of it, and the greatest depth of water and main channel was west of the island. The plaintiff owned the tract of land on the west side of the river, and the jury found for him. In affirming the case the court said:

"The rock in question is west of the main channel, which runs between it and Hill Island, but it is doubtful whether, in a line perpendicular to the river-bank, the rock is nearer to the island or to the bank; it is, however, far west of the middle of the river, measuring from bank to bank across the island. The jury were instructed, that, under these circumstances, the rock was west of the medium filum aquae; and to that instruction objection is made. The evidence showed that the water west of the rock was shallow, and that in dry summers much of it disappeared; the low water mark may have been seen, as Mr. Aiken thought it was, nearer

to the rock than the island was, but there was contrariety of testimony on this point which, the instructions rendered it unnecessary for the jury to consider. We must then look to the propriety of the instructions. The situation of the main channel, whether east or west of the rock, is unimportant, for the ordinary low water mark on each side having been fixed, the medium filum aquae is ascertained by measurement across, without regard to the depth of the water. The question then is whether the measurement to fix the boundary of plaintiff's rights should be from his bank to Hill Island, or to the other bank of the river.

"If the western margin of Hill Island belonged to another person, the exact boundary between that person and the plaintiff would be midway between the island and the western bank of the river. But islands in rivers, like rocks (which are only small islands), fall under the same rules concerning ownership which apply to the soil covered by water. This proposition, which seems to have been established by a consideration of the instances of islands formed by alluvial deposits, embraces all islands, whether of recent formation or remote origin. (3 Kent Com., 427; 2 Bla. Com., 261; 4 Pick., 269; Harg. Law Tr., 5-36.) If they have not been otherwise appropriated by some lawful means, they belong in severalty to the owners of land on each side of the stream, according to the line of division which would have existed if they had continued under water. An island lying on one side of the filum aquae belongs to the owner of the bank on that side, if no opposing right to it has been lawfully acquired by another person. If it is situated so near the middle of the river that the original filum aquae passed through it, and no opposing right has been acquired, it belongs to the owners on the two banks, according to the original dividing line.

"Upon the supposition of there being nothing in the character of the river to forbid, the plaintiff's right, under the grant of 1772, extended prima facie to the middle of the river, or original dividing line; and to rebut the title shown by him, less evidence did not suffice as to the islands and soil covered by water which were included within his boundaries, than would have served as to his land on the western bank of the river. Now there was no evidence that the portion of Hill Island, which lies west of the original filum aquae, belonged to any third person; no grant of it from the State appeared,

nor any such possession as could give a title under the statute of limitations. A claim of one Robinson, said to be under a sale made at Lancaster, was spoken of, but no papers were adduced nor any evidence given which showed the validity of the claim to any portion of the island, much less to that portion which lies west of the middle of the river—that is the dividing line between the districts of Chester and Lancaster. Nothing then limited the plaintiff's rights to the filum aquae between his bank and Hill Island, and the instructions on this head were proper.''

It will be readily seen from the foregoing extract that the court fully recognized the application of the doctrine of riparian rights to islands which have been granted like the mainland, but decided against the owner of Hill Island because there had been no grant thereof to any one, and it and the rock passed to the owner of the mainland as an island, under the general doctrine of riparian rights.

In Trustees of Hopkins Academy v. Dickinson, 9 Cush., 545 (1852), the Connecticut River had completely changed its bed. In all that part of the river bed, which had become stagnant by the change of current, sediment began to settle and accumulate, shoals and islets arose, detached, at first, but gradually uniting with each other; when above water, vegetation came in, and ultimately land was formed, which was available for use and was valuable. The question before the court was, whose property were the lands thus newly formed, and upon what legal principles should the right of property in them be ascertained?

After recognizing the common law rule that the property in the soil of rivers not navigable, subject to public easements, belonged to those whose lands bordered upon them, the court said:

''In the case just now supposed, of an island arising in the middle of the river, it is divided by that line which was the thread of the river immediately before the rise of the island. But that line must thenceforth cease to be the thread of the river, or filum aquae, because the space it occupied has ceased to be covered with water. But, by the fact of an island being formed in the middle of the river, two streams are necessarily formed by the original river dividing it into two branches, the island itself, having become solid land, forms itself a bank of

the new stream on the one side, and the old bank on the main shore forms the other. And the same rule applies on the other side of the island. There must, then, be a filum aquae to each of these streams, whilst the old filum acquae is obliterated to the extent to which land has taken the place of water. But this island, having all the characteristics of land, may soon be divided and sub-divided, by conveyances and descents, and all the modes of transmission of property known to the law, and thus become the property of different owners. Now suppose another island formed in one of these branches, between the first island and the original main shore. It seems to us that it must be divided upon the same principle as the first but, in doing it, it will be necessary to assume as the filum aquae the middle line between the first island and the original river bank on that side.''

Branham v. Turnpike Company, 1 Lea (Tenn.), 704 (1875), was a bill in equity to try the ownership of an island in Bledsoe Creek. The plaintiffs owned the land on the west bank of the creek, and claimed the whole island; the defendants owned the land on the east side of the bank, and claimed about one-half of the island. It will be noticed that this case was decided in the circuit court of Tennessee by Chancellor Lurton, now Mr. Justice Lurton of the United States Supreme Court; and, upon the appeal, that the opinion was written by the late distinguished Chancellor Cooper, of Tennessee. The island in controversy had been in existence from the time beyond the memory of man, varying at times in height and size, but always visible in ordinary stages of the water, and only covered at high floods. The stream separated into two branches at the head of the island, the eastern branch being the main stream; while the western branch towards the head of the island became dry, or nearly so, in very low water. With the exception that the west bank had been constantly and gradually receding, and the further fact that the island had grown some in length, the appearance of the creek, banks and island had remained substantially the same. The middle line between the two banks bisected the island lengthwise into two nearly equal parts. In delivering the opinion of the court Judge Cooper said:

''The grant of land by the State, bounded by, on, or along a stream not navigable, carries title to the centre or thread of the stream, and to an island lying next to

that bank between it and the middle line. Stuart v. Clark, 2 Swan., 10; Lunt v. Holland, 14 Mass., 149; Luce v. Carley, 24 Wend., 451; Claremont v. Carleton, 2 N. H., 369. The same rule applies to a private grant, where the grantor owns the entire stream. Hays v. Bowman, 1 Rand., 417; King v. King, 7 Mass., 496. The thread of a stream is the middle line between the shores, irrespective of the depth of the channel, taking it in the natural and ordinary stage of the water, at its medium height, neither swollen by freshets nor sunk by drouth. If there be an island on one side of that line, or if an island form there, it belongs to the owner of the bank to which it is nearest, and the filum aquae is in the centre of the stream beyond. Missouri v. Kentucky, 11 Wall., 395; Walker v. Board of Public Works, 16 Ohio, 544. If the island be situated, or be formed so as to cover the middle thread it would belong in severalty to the owners of the land on each bank, according to the original dividing line or filum aquae, curving with the shores. Ingraham v. Wilkinson, 4 Pick., 274; Deerfield v. Arms, 17 Pick., 41; McCullough v. Wall., 4 Rich., 68. The existence of an island, whether old or newly formed necessarily creates two streams, each of which will have its own filum aquae as to that part of the stream in relation to any new acquisition of title to land bordering thereon. Hopkins Academy v. Dickinson, 9 Cush., 544. And gradual accretions to such an island, as to any new title, would go to the previous owner. Saulet v. Shepherd, 4 Wall., 508.''

In Griffin v. Kirk, 47 Ills. App., 258 (1892), Kirk was in possession of the western side of an island in the Mississippi River between Illinois and Missouri, and brought his suit of forcible detainer against Griffin, who, as tenant of the owner of the land lying opposite on the Missouri shore, had taken possession of a tow-head or sandbar which had formed in the river between the island and the Missouri shore. In sustaining Kirk's right to the tow-head island, the court said:

''The survey of the land described in the plaintiff's complaint is made by projecting the lines from the shore to the centre of the stream, so as to give the adjoining proprietor a portion of the accretion to a centre thread of the stream in proportion to his shore line, and the possession of a riparian proprietor is to the centre thread of the stream to as full an extent as if expressly

included in the terms of the description. And he may maintain replevin for rock or gravel taken therefrom by a trespasser who invades that possession. Braxon v. Bressler, 64 Ill., 488.

"And the riparian proprietor owning to the centre thread, unless the grant shows a contrary intention, gives him the use and appropriation of ice as an accession to his land and he may maintain trespass quare clausum fregit against any stranger who invades that possession. The Washington Ice Company v. Shortall, 104 Ill., 46. And as a necessary consequence it must be held that his right to recover in trespasses in such cases is by reason of his ownership of the particular tract carrying his possession to the thread of the stream. A lease of the entire tract so abutting on a navigable river would necessarily carry the tenant's possession to the riparian rights of property so abutting. That the tenant might maintain an action for a trespass on his possession and one in possession of such tract may maintain forcible detainer against one who invades his possession of lands acquired by accretion."

A similar case arose in the same locality and out of substantially like facts in Griffin v. Johnson, 161 Ills., 377, decided in 1896. It was an action in ejectment brought by Johnson to recover part of a tract of land formed by the lodging of drift and deposits in the Mississippi River between land owned by Johnson on Crain's Island and the Missouri shore. In that case the court used this language:

"The situation is the same as stated by Mr. Justice Phillips in relation to an adjacent tract, in the case of Griffin v. Kirk, 47 Ill. App., 258. Crain's Island is in the State of Illinois, and when it was surveyed by the government the main channel of the Mississippi River was on the Missouri side of the island. About the year 1845 the main or deep-water channel changed from the Missouri side of the island to the Illinois side, where it has since remained. For twenty years or more after that change the river also ran between the island and the Missouri shore, in a solid body of water. Twenty-five or thirty years ago what the witness called a "tow-head" was formed by the lodging of logs in this channel west of the island. Around these logs drift accumulated, causing a gradual increase, until there remained only a slough on each side. After the tow-head appeared the

principal channel was west of it, and boats ran through there at some seasons, when the water was high, as late as 1892. These sloughs are sometimes dry, with the exception of water standing in low places, and when the river is high the water runs through them, practically on the west side of the tow-head or sand-bar. Plaintiff sought a recovery for that part of the land thus formed, embraced by projecting the lines from the shore to the centre thread of the channel between Crain's Island and the Missouri shore.

"No propositions of law were submitted by either party, and no complaint is made of any ruling upon the trial. The only question is whether the court correctly decided upon the evidence. The title of plaintiff as a riparian proprietor extended to the middle thread of the stream west of the Island. (Middleton v. Pritchard, 3 Scam., 510; Braxon v. Bressler, 64 Ill., 488.) The recovery of plaintiff was to the centre thread, to which her title extended, and the finding and judgment were justified by the evidence."

Warren v. Manufacturing Company, 86 Me, 32 (1893), was an action for a partition and division of the water of the Presumpscot River, and of its use. The waters of the river had separated into two channels, and formed an island about 350 feet long and 150 feet wide. After recognizing the rights of the respective parties to the water of the stream depending upon their several rights as riparian owners of the land upon either side of the stream, the court said:

"Where, however, the waters of a river are divided by an island so that, as alleged in the bill, they flow past the island in two distinct channels, and where the island is itself divided in ownership as also alleged in the bill, the riparian owners on the two main shores opposite the island, are not opposite riparian owners with common and equal right to the use of all the water flowing between them. On the contrary, each such owner has for an opposite, the owner of that part of the island facing his land. Their equal and common right is confined to the flow of the water in the channel between them. They have no legal right in common or in severalty in the water naturally flowing between other owners on another channel on the other side of the island where they have no land."

In Lorman v. Benson, 8 Mich., 18, in discussing the wisdom of adopting the common law rule as to riparian rights, the court said:

"It is urged that this ruling will interfere with the improvement of rivers, and disturb the title of islands. But these objections are not well taken. The public authorities can regulate water highways as well as land highways, although the soil of neither belongs to the State. And if the government sees fit (as in the case with all islands in this river, which have not only been kept separate as property from the mainland, but most have been named and distributed between Great Britain and the United States by treaty) to regard each island as a separate property, this infringes no common law rule. Islands have always been susceptible of separate ownership, and when so separated the filum aquae is to be drawn between them and the mainland."

In West v. Fox River Paper Co., 82 Wis., 655, the court said:

"The contention of learned counsel of the respondents, is, first, that riparian ownership attaches to this island, the same as to the main shores of the river. This is not contested by the learned counsel of the appellants. This principle is necessary to the plaintiff's claim to more than one-half of the river and seems to be well established by the authorities cited in respondent's brief and rests in reason as well. Where the mainland on both sides of the stream, and the island dividing the stream, have been all and separately surveyed and sold to different persons by the government, it follows by necessary implication, that the island was reserved from the grant of the mainland and the filum aquae is established in the centre of the channels on both sides between the mainland and the island. To each owner of the opposite mainland, the island becomes the opposite shore, and as to them two fila aquae are established. Riparian rights are valuable property and are attached to all land bordering on a stream; and the owner of an island is as much entitled to such rights as the owner of the mainland."

And in Stolp v. Hoyt, 44 Ills., 219, it was held:

"That in a grant of land lying on a stream (not navigable) if there be a clear reservation of the islands either expressly or by implication, they do not pass to the grantee, and the filum aquae is the centre thread be-

tween the mainland and the island. There is no more ground for holding that the owner of the shore owns the water to the island, than the owner of the island owns the water to the shore.''

And in Whitaker v. McBride, 197 U. S., 510, the Supreme Court of the United States said:

''It is further contended that the lands of one of these patentees is itself part of an island, and that, therefore, he has no riparian rights. It is sufficient reply to this contention that the government surveyed and patented the lands up to the banks of the channel in which the island in controversy is situated. And a patentee, although his lands may itself be surrounded by two channels of the river has all the . rights of a riparian owner in the channels lying opposite his banks.''

Without further elaboration, we conclude that both reason and authority sustain the view that an island, separately granted by the Commonwealth, and without any right or conflicting claim shown by the owner of the mainland, has all the riparian rights that attach to a mainland. The decision, under the facts of this case, does not require us to go any further, and we do not attempt to lay down a rule that might be applicable to islands that may have been granted subsequently to the grant of the mainland without restrictions upon the boundary of the mainland. The rule is well stated by Farnham, in his work on Water Courses, Vol. 3, page 2503, as follows:

''Therefore, if there be an island in a stream in which the riparian owners owned to the thread, which is separately surveyed and sold by the government to different parties, than those to whom the adjoining land is sold, the grantees of the mainland do not acquire the island, and the riparian owners of the mainland own only to the thread of the stream between the shore and the island.''

And in Gould on Waters, page 329, the rule is similarly stated, as follows:

''If an island in a private river has been lawfully appropriated by another person, or reserved in a grant, the thread of the stream midway between the island and the fast land is the boundary of the adjoining owner's title.''

So, also, 17 A. & E. Ency. of Law, page 536; Linthicum v. Coan, 64 Md., 349; and Mulvy v. Norton, 100 N. Y., 424.

The seeming discrepancy between the decisions of the various States with respect to the rights of island owners is explained by the fact that some of the States have not adopted the common law rule that carries the title of riparian owners to the middle thread of the stream.    That rule has been adopted in Connecticut, Delaware, Georgia, Illinois, Kentucky, Maine, Maryland, Massachusetts, Michigan, Mississippi, Nebraska, New Hampshire, New Jersey, partly in New York, and in Ohio, South Carolina and Wisconsin.    It has been rejected in Pennsylvania, Virginia, North Carolina, Alabama, Florida, Texas, Tennessee, Iowa, Kansas, Minnesota, Missouri, Oregon, Nevada and California.    (See Kinkead v. Turgeon, 74 Neb., 480, 121 Am. St. Rep., 740.)

In those jurisdictions where the common law rule is not in force, and the title of the riparian owner extends merely to the low-water mark, the title to the bed of the stream remains in the State; and in such jurisdictions, in order for a riparian owner to acquire title to lands by accretion, the same must grow to and be added to his shore line—must grow to and be added to the mainland. Consequently, in those states, all islands, tow-heads and bars that may form in the stream, and which are not connected with the shore, belong to the State, and are not carried by the grant of the mainland.    Such bars, tow-heads and islands form upon the property of the State, and not upon or against the lands of the riparian owner.    On the other hand, in those jurisdictions where the common law rule is in force, a grant from the State carries the title to the middle of the stream, and the State parts with all its title to that point, including all bars, tow-heads and islands that form between the mainland and the middle of the stream.    They go with and constitute a part of the ownership of the bed of the river. In such cases the bed of the stream was already his, and the soil was merely dumped on it from above and thus raised above the waters.

The distinction here pointed out is illustrated by the decisions in East Omaha Land Co. v. Hanson, 117 Ia., 96, and Hahn v. Dawson, 134 Mo., 581, in which it was held that where an island springs up in a stream, it is an accretion to the soil in the bed of the river and not

to the land of the riparian owner, even although it afterwards becomes united with the mainland. But, both Iowa and Missouri have rejected the common law doctrine, and, as we have seen above, the owner of the mainland is, in those states, restricted in his ownership to the water's edge and the title to the bottom of the river remained in the State.

This rule is stated in 29 Cyc, 354, in the following language:

"The ownership of an island generally follows the ownership of the bed of the water, so that if the State owns the land under water, it belongs to the State, while if the riparian owner has title to the bed, the island belongs to him up to the line of his ownership of the bed."

From these abundant authorities we feel amply justified in concluding that where a permanent island of long existence having a separate and well defined body of land, has been patented and conveyed apart from the mainland, and it does not appear that the mainland has therefore been granted, the island constitutes opposite sides to the two shore owners, making two channels, and giving to the mainland owner title to the bed to the middle of the stream between the island and the shore, and no more.

We conclude, therefore, that the circuit judge erred in refusing to recognize the riparian rights of the plaintiff as owner of Island No. 3, as he did when he instructed the jury that appellant's title papers did not include the small islands in controversy.

Upon return of the case, if the evidence is the same, such an instruction should be given, along with such qualifications or other instructions that will present appellee's claims of adverse possession and limitation, as shown by the pleadings.

So much of the former opinion as is inconsistent with this opinion is withdrawn, the judgment is reversed, and the cause is remanded for a new trial consistent with the views herein expressed.